## HEMPHILL vs. MILLER.

Where depositions taken under a commission in a chancery cause have been filed and published several years, without objection, to allow exceptions after such a lapse of time, and such gross laches, upon the ground that "the witnesses were not properly sworn, nor the depositions certified according to law," could not fail greatly to surprise the opposite party, and would be gross unfairness.

It is error to suppress depositions, upon a motion to suppress them, because the evidence was incompetent and irrelevant, and inapplicable to the issues, where a portion of them is relevant and applicable to the issue, and the motion is general, without discriminating between such of the depositions as are, and such as are not relevant.

It is clear, that where exceptions to a part of the answer are filed and sustained, all of the answer not affected by such exceptions, is left standing in the cause.

Where a vendor of real estate remains in possession under a subsequent contract to make certain improvements, such subsequent contract is a distinct and independent agreement, and is binding upon the parties.

A party sells an improvement upon the public land, and remains in possession under a parol agreement to make certain improvements, for which, together with the price

of the land, he is to be paid at a certain day; the vendee fails to comply with his part of the contract at the time stipulated: afterwards the vendor sells to a third person at an advanced price: HELD, That it would be improper to decree a specific performance, not only because it had become impossible by a subsequent sale of the public lands by the United States, but because of the laches of the purchaser: and that the vendor will be considered as a trustee for the vendee for the advanced price; and that such subsequent sale be ratified.

*Appeal from Lafayette Circuit Court in Chancery.*

Hon SHELTON WATSON, Circuit Judge.

PIKE & CUMMINS, for appellant. The depositions could not have been suppressed on account of the first ground stated in the motion to suppress. They were taken in 1839, are marked *filed* 3d March, 1842, on which day the record shows they were opened and published, and the cause was that day heard upon them, the complainant having leave to present exceptions to them in a written argument, which he never did. It was too late, *nine years and seven months afterwards*, to raise a question as to whether the witnesses were properly sworn, and the depositions properly certified.

This is a bill for specific performance of a parol contract. We will not argue, that such being the case it may be shown to have been varied, modified, abandoned, or rescinded, by parol. Admitting the premises, nobody will dispute this conclusion.

For, even as to sealed contracts, the rule laid down by the court, when the case was here before, is made only in cases at common law. *Kaye vs. Waghorne*, 1 *Denio.* 428; *Suydam vs. Jones*, 10 *Wend.* 180; *Barnard vs. Parker*, 11 *Wend.* 30 ; and *Delacroix vs. Buckley*, 13 *Wend.* 71, cited and relied on by the court, were cases at common law. And so were *Preston vs. Christmas*, 2 *Wils.* 86, *Blake's case*, 6 *Co. 3*, *Alden vs. Blague*, *Cro. Jac.* 99; and *Snow vs. Frankleys*, *Lutw.* 108 ; opposed to which (*meliore ratione*, we think), are *Munson vs. Perkins*, 9 *Pick.* 298; *Ratcliff vs. Pemberton*, 1 *Esp.* 35; *Latimore vs. Harsen*,

14 *J. R.* 330; *LeFevre vs. LeFevre,* 4 *Serg. & R.* 241; *Dear-born vs. Cross,* 7 *Cowen* 48; *Fleming vs. Gilbert,* 3 *J. R.* 531.

It does not necessarily follow, because a contract is valid, and equity would not rescind it or relieve against it, that therefore it will decree it to be specifically performed. Sometimes damages may be recoverable at law for a breach of a contract, of which equity would yet not decree specific performance; and sometimes damages may *not* be recoverable at law, and yet relief would be granted in equity. 2 *Story Eq.,* sec. 741; *Weale vs. West Mid-dlesex Water Works' Company,* 1 *Jac. & Walk.* 370. The interference of courts of equity in this way, is discretionary. They will not so interfere, except where it would be strictly equitable to make decree for specific performance. If the parties have so dealt with each other, in relation to the subject matter of a contract, that the object of one party is defeated, while the other is at liberty to do as he pleases, in relation to that very object, equity will not grant relief, but will leave the parties to their remedy at law. 2 *Story Eq.,* secs. 742, 750.

It will not decree specific performance, where, from a change of circumstances or otherwise, it would be unconscientious to enforce it. *Id.,* sec. 751.

It requires a much less strength of case on the part of the defendant, to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain it. The agreement must be CERTAIN, FAIR, and JUST, in all its parts. *Id.,* sec. 769. The party applying for performance must show that he has been in no default, and that he has taken all proper steps towards performing on his part. *Id.,* sec. 771.

If the court holds that the contract was not expressly waived or abandoned, still we contend that the unexplained neglect and delay of Miller, will avoid his claim for specific performance: that, if the court does not so think, and holds that Hemphill had no right to sell, still the decree is erroneous, because it denies any allowance for improvements, and because the court below suppressed the depositions proving these improvements and their value.

And we submit, with great confidence, that so much of the depositions as proved the parol agreement, made the day after the purchase, was admissible, because this is a suit to enforce a parol agreement, or, at least, an agreement resting partly in writing and partly in parol: and that so much as proved a subsequent waiver and abandonment by Miller—so much as proves the message he sent to Hemphill, was admissible, because the whole contract *might* well be so abandoned; and, even if not, yet after such acts on his part, if gross neglect or delay would put an end to his right to specific performance, *a fortiori*, an express refusal to comply with his contract would do so. Neglect and delay do not, strictly speaking, *destroy* the sealed or written contract in any case: but leaving it to stand, it forms a breastwork against it, by making it inequitable for the party to claim to enforce it. The court denies specific performance of many agreements which it would not, on a bill for the purpose, rescind; but leave the parties, each to his remedy, if he has any, at law.

On this ground, the testimony was clearly admissible, and its admission is perfectly consistent with the former decision of the court. It would be singular, indeed, if it were not admissible, in a case where, by proceeding for compensation in the room of specific performance, the plaintiff claims what is due to him, *ex æquo et bono*. It would be indeed strange, if the defendant could not show that it is a fraud in the plaintiff to claim damages or compensation, in consequence of an act which he authorized to be done, and, therefore, is absolutely estopped to complain of.

WATKINS & CURRAN, for appellee. Hemphill admits the original agreement with Miller, and his subsequent sale to Carson, as charged in the bill; but, in his answer, he sets up a parol agreement in avoidance: and when the matter came before this court (4 *Eng. Rep.* 488) on exceptions to the answer, it was held, that the matter could not be set up, and the exceptions to the answer were sustained. This decision, whether right or wrong, is the law of this case; and settles and concludes every question now presented.

No new question is presented by this record. The only error that can possibly be assigned in this appeal, is as to the depositions. As to this assignment, we submit: . 1st. That a party will not be allowed to prove what he cannot plead—if the answer was exceptionable, certainly the depositions cannot be admitted. 2d. The depositions were irregular and informal, and were, for that reason alone, properly suppressed.

As to the error relied upon, that Hemphill was not allowed anything for improvements alleged to have been made by him between the time of the sale to Miller and the sale to Carson, we submit: 1st. That, by examination of the previous decision of this court, it will be seen that the statement about the improvements, was coupled with, and constituted part of the parol agreement which was reached by the exceptions to the answer. 2d. That even if not reached by the exception, it was matter in avoidance; the proof of which devolved upon Hemphill, and the depositions being excluded, there was no proof. And 3d. That he could not, in any event, be entitled to a deduction for improvements.

TRAPNALL, for the appellee. There was no notice of the time and place of the taking of the depositions, nor any appearance by Miller or his counsel; nor were the witnesses sworn to testify the whole truth; nor were the depositions reduced to writing in the presence of the officer before whom they were taken, nor were they certified according to law. *Digest, ch.* 55, *secs.* 6, 7, 13, 15.

The depositions relate to the subsequent verbal agreement between the parties, which since the decision of this case in 4 *Eng.* 488, can no longer be considered a part of the defence.

Miller had full power to ratify the sale to Carson by Hemphill, and hold Hemphill as trustee, bound to him for the purchase money. 2 *Story's Eq.* 506, *sec.* 1262; 2 *J. C. R.* 441; 1 *J. C. R.* 581.

So much of Hemphill's answer being struck out as related to

the subsequent parol agreement, by virtue of which Hemphill made the improvements, if any, and claims an allowance for the same, there was nothing upon which the court could have grounded the decree allowing for the value of improvements.

Mr. Justice SCOTT delivered the opinion of the Court.

This cause was heard on appeal in this court, during the January term, 1849, (4 *Eng. R.*) and was sent back to the court below for further proceedings. After its return to that court, Miller moved to suppress the depositions of Hemphill, which had been on file and published for nearly ten years before, upon the ground: 1st. That the witnesses were not properly sworn, nor the depositions certified as required by law. 2d. That they were incompetent and irrelevant, and not applicable to the issues. This motion was granted and the depositions ruled out, to which Hemphill took a bill of exceptions. The cause was then heard on the bill and exhibits, answer and replication, and the court being of opinion that it was impossible for Miller to have a specific performance of the agreement for which he proceeded, and that Hemphill ought to be charged as trustee for Miller, and compelled to account for the amount of the sale to Carson with interest, less the amount of the writing obligatory executed by Miller to Hemphill, with interest from the time it fell due until the 1st of April, 1836, decreed accordingly for the sum of $3.217, which, upon computation, was found to be balance of principal and interest up to the date of the decree.

Hemphill appealed to this court, and, afterwards, upon application here, the execution of the decree was, upon the usual terms, suspended by the order of this court, until his appeal could be heard. The complainant below prayed for specific performance of a contract set out in his bill; and, in the alternative, that he might be decreed, the price for which the land in question was sold by Hemphill to Carson, and that Hemphill should account for the same, and for rent for the year 1835.

The case made by the bill, and accompanying exhibits, was

that on the 6th of December, 1833, "or thereabouts," Miller purchased of Hemphill "a certain improvement, or parcel of land," situated in the county of Lafayette, on the public unsurveyed lands of the United States, of which Hemphill was the owner, for the sum of $500, to be paid the 1st day of January, 1835, for which sum Miller executed to Hemphill his *sealed* note, and Hemphill executed to Miller a deed for "*said improvement or land*," with covenants of warranty against all persons except Mexico and the United States. "That, at the time of the sale, and conveyance aforesaid, it was futher *verbally* agreed between the parties," that Hemphill should enter into, and upon the land and improvement so sold and conveyed, and take, and hold possession thereof, *under* Miller, and raise a crop thereon in the year 1834, and "*restore*" the possession thereof to Miller, in the month of November, 1834, or at any time thereafter, when Miller (who then lived in the State of North Carolina,) should come and demand possession. That, at the time Miller expected and intended to have removed to said land and improvement by November, 1834, but that by "unavoidable delay, he was hindered and prevented from doing so." That afterwards, (but when it is not stated) when Miller had disposed of his property in North Carolina, and was on his way to Arkansas, with a view to take possession of, and settle upon the improvement and land in question, he heard, for the first time, in the State of Tennessee, (where in consequence he remained for some time afterwards) that Hemphill had disposed of said improvement and land, and would refuse to *restore* possession to Miller, in accordance with the verbal agreement above alleged. That, on or about the 30th of April, 1835, Hemphill sold and conveyed "*the said improvement and land*" in question, "with some other improvements of very small value," to Samuel P. Carson, for $3.750, $1000 of which was paid down, and the residue to be paid on the 1st of January, 1836. That Carson knew of Miller's previous purchase, and of the conveyance to him, and acted in confederacy with Hemphill to defraud Miller. That on the 16th of November, 1835, Miller, at Lafayette

county, tendered to Hemphill the amount of the sealed note, and all interest that had accrued upon it, and demanded possession of Hemphill, who refused to take the money, and to restore the possession, unless, in addition to the amount of the sealed note, Miller would also pay the further sum of $3.750. A few days afterwards, Miller filed his bill.

Hemphill, in his answer, admitted the sale and the execution of the sealed note, and the deed for the improvement and land, as stated in the bill, but in responding to the contemporaneous verbal agreement alleged in the bill, denies that he was to enter into and upon the improvement, and hold possession *under the complainant*, and to restore the possession in the month of November, 1834, or at any other time thereafter, when he should demand it, as alleged in the bill, and charges the truth to be, that he was "to have and hold the possession, use and cultivation," from the time of contract, "until the 1st day of November, 1834, for his own use and benefit," and that in addition to these terms of that verbal agreement, he was, in the year 1834, to crib for Miller, on the improvement, 1000 bushels of corn, which Miller was to receive on the 1st day of November, 1834, (as well as the possession of the improvement on that day) and pay him fifty cents a bushel for the same. That he did crib the corn, and was ready and willing to deliver it, as well as the possession of the improvement, at the time agreed upon, but the complainant failed to come to receive them at that time, or any time before. He denies all knowledge of the matters alleged to have transpired in North Carolina and Tennessee, and states his unbelief of them all. He denies that Miller, either on the 16th day of November, 1835, or at any other time, ever tendered him any sum of money for any purpose whatever, or ever demanded of him the possession of the improvement in question, or that he ever refused to give Miller possession unless he would, in addition to the amount of the sealed note, also pay the further sum of $3.750, as is alleged in the bill. But he admits that about the 15th November, 1835, he did say to Miller, that there was no other way in which the mat-

ters in difference between them in the premises could be settled, except that Miller should surrender the deed aforesaid, and receive his sealed note in exchange for it, " agreeable to the contract," which Hemphill had before stated in his answer, and of which we will presently speak; and then, that Miller might, by arrangement with Carson, make the same payment to Hemphill, as Carson had, and was to make, and thus be placed in his stead.

He denies the sale to Carson, upon the terms stated in the bill, but admits, that about the 30th of April, 1835, he sold to him the improvement in question, together with a certain other improvement, known as "Hemphill's Bend," for the aggregate sum of $3.700, of which, the price of the improvement in question was $2.200, and not more, and that upon the execution of the deed to Carson for both improvements, he paid the respondent $1000, and executed to him his writing obligatory for $2.750, payable in the month of April, 1836: $50 of which sum was for five cows and calves, and that he gave Carson possession the 1st January, 1836. The residue of the answer, needful to be noticed, is as follows, to wit: "But it is true, and so this respondent charges the truth to be, that some time after the sale of said improvement to said complainant as aforesaid, to wit: on or about the 7th day of December, in the year 1833, it was verbally agreed between this respondent and said complainant, that said complainant should pay this respondent a reasonable compensation for all necessary improvements which this respondent might think proper to make on said improvement, by building necessary houses and cribs, and opening and enclosing land, and fitting the same for cultivation, and repairing and clearing the well on said premises; that said complainant would cause to be delivered to this respondent, in time to make a crop in the year 1834, a negro man slave, not under twenty, nor over twenty-three years of age, not having a trade, to be of the value of six hundred dollars, which said negro man slave, this respondent was to receive in payment of the aforesaid one thousand bushels of corn, and the overplus to be applied to the pay-

ment of such improvements as this respondent should have made upon said improvement.

And it was *then and there further* verbally agreed between this respondent and said complainant, that the said complainant should leave the deed executed and delivered by this respondent to the complainant as aforesaid, with Richard Pryor, of the county of Hempstead, in the Territory of Arkansas, and that in case said complainant did not come into the county of Lafayette aforesaid, on or before the said first day of November, 1834, and receive the possession of said improvement from this respondent, and the 1000 bushels of corn to be cribbed by this respondent as aforesaid, and pay this respondent the value of all necessary improvements as aforesaid, over and above the value of the said negro man slave, to be delivered to this respondent by said complainant as aforesaid, then the said deed for said improvement, made and delivered by this respondent to said complainant as aforesaid, was to be delivered up to this respondent by the said Richard Pryor, and become null and void; and that this respondent should deliver up the note, executed and delivered to this respondent by said complainant as aforesaid, and the same to be null and void, and that all contracts made and entered into between this respondent and said complainant, should be canceled and dissolved, as well verbal as written. And this respondent avers," &c.; (the answer then proceeding to negative, in detail, the several matters undertaken on the part of Miller, and affirming his own readiness and willingness to comply on his part, and Miller's failure.)

Before replication, the complainant filed exceptions to the answer, in the following terms, to wit:

"And the said complainant, *as to so much of the answer* of the said defendant, Andrew Hemphill, as sets forth that it was verbally agreed between the defendant Hemphill, and the complainant, that said complainant should leave the deed, executed and delivered by said defendant Hemphill, with Richard Pryor, of the county of Hempstead, and that in case said complainant did

not come into the county of Lafayette aforesaid, on or before the 1st day of November, 1834, and receive possession of said improvement from said defendant Hemphill, and comply with the conditions of said supposed verbal agreement, as in the answer of said Hemphill is alleged, then, that the said deed for said improvement, made and delivered by said Hemphill to said complainant as aforesaid, was to be delivered up to said Hemphill by the said Richard Pryor, and become null and void, and that said Hemphill should surrender up the note executed and delivered by said complainant to said Hemphill, to said complainant, and that the same be null and void, and that all contracts entered into between said Hemphill and said complainant, should be canceled and dissolved, as well verbal as written. *This defendant excepts :* 1st. Because the same is not responsive to the allegations of the bill. 2d. Because when said deed was delivered by said defendant to complainant, it became, and was absolutely, the deed of said defendant, and no subsequent verbal agreement could make it an escrow. 3d. Because a verbal agreement cannot vary a deed: and 4th. Because the said supposed parol agreement alleged in said answer, appears, upon its face, to be a naked agreement, made without any consideration. The complainant, therefore, prays that the said exception be sustained, and that he be decreed his reasonable costs.

These exceptions were overruled, and afterwards, replication was filed to the answer, and the case was set for hearing. Afterwards it was heard, on the 30th of March, 1842, submitted and taken under advisement, as it was at the next three succeeding terms. On the 10th of October, 1845, the bill was dismissed for want of prosecution, and a decree rendered. On the 10th of April, 1846, on motion sustained by affidavits, the case was re-instated, and on the 30th September, 1846, an appeal was granted to the complainant, on petition, by one of the judges of the Supreme Court; and at the January term, 1849, the case was, as already stated, reversed here and remanded. In the mean time, Miller, by his counsel, had taken other steps in the court below,

19B

by an original bill, in the nature of a bill of review, supplemental bill, and bill to execute a decree, which it is unnecessary to notice, as they seem to cut no figure in the case we have to decide.

The first question to be considered is, whether or not the court below erred in granting the motion to suppress the depositions. They were all taken in the year 1839; Hall's and White's, under an order of court made in March, 1836, and Clark's, under an order of court made in March, 1839; and having been filed, were, by leave of court, opened and published, on the 30th of March, 1842, and the cause was that day heard upon them; when, by express leave of the court, the complainant was allowed to present exceptions to them in a written argument, and to have the same benefit thereof at the succeeding term, "as if the said exceptions were now formally made out." It does not appear that any exceptions were ever presented, although the cause remained in that court, some four years afterwards, until those we are now considering, which were filed the 4th of November, 1851. To allow exceptions after such a lapse of time, and such gross laches, upon the first ground taken, *that is to say*, "because the witnesses were not properly sworn, nor said depositions certified according to law," could not fail greatly to surprise the opposite party, whose witnesses might, in the mean time, have departed this life, or to parts unknown, to say nothing of the gross unfairness of such a course in lulling the opposite party into security by such long seeming acquiescence.

In order to determine the validity of the other objection taken, to wit: That the evidence was incompetent and irrelevant, and inapplicable to the issues, it will be necessary to look into the depositions and into the state of the pleadings.

*William Clark* states, that he came from and went back to Tennessee in company with Miller, and was present on the 6th of December, 1833, when the contract between Miller and Hemphill was made. Hemphill sold for $500, payable the 1st of January, 1835, and Miller was to pay him for all improvements he

should make on the place from that time, until he (Miller), should move to the country, which, he said, would be in January, 1835. Miller engaged 1000 bushels of corn of Hemphill, and was to let him have a negro man. The price of the corn he did not recollect, and the price of the negro he did not know. He was called on by both to witness, that if Miller did not move to the country by January, 1835, and pay Hemphill $500 for the place, and also for all labor Hemphill should do on the premises, such as clearing, fencing, breaking up land, building negro houses, corncribs, stables, &c., from the date of the contract until he should move to the country, the contract, both written and verbal, should be null and void, and the deed and note to be given up. In February, 1835, witness left the State of Tennessee for Arkansas, and Miller authorized him to call on Hemphill, and say to him, that he might consider the contract at an end, and that he would have sent the bill of sale, and gotten up his note, but that he did not have the former with him, and to tell Hemphill that he would enclose it to some friend in Arkansas to make the exchange. That after the suit was brought, he had a conversation with Miller, in which he said, that he thought he had the advantage of Hemphill, and if he could make five or six hundred dollars out of him, he thought it was well enough; and said, also, that when he demanded the improvement of Hemphill, he agreed to let him have it, provided he would pay him the five hundred dollars, and for all the labor he had done on the premises, in accordance with the contract, but he said he would not take the place because Hemphill had done labor to the value of $1500 or $2000 on it.

*Durant H. White* stated, that he was present on the 6th day of December, 1833, when the trade between Miller and Hemphill, in regard to the improvement, was made. That Miller was to pay Hemphill $500 within one year, or thereabouts, from that time, for the improvement, and also to pay him for all improvements he should make on the place, such as clearing, fencing, breaking up ground, and building houses, such as kitchens, stables, corn-cribs, negro houses, &c., and for the enclosing and put-

ting land in cultivation, he was to pay Hemphill at the rate of $10 per acre, for all that Hemphill thought proper to clear and fence for his own use. That as to the buildings, there was no agreement as to the price, or as to the number to be built, only that he was to pay what they were worth. That Hemphill built ten houses, sunk a well on the premises, and enclosed and put in cultivation 120 or 125 acres. All the labor thus done, the witness. estimated to be worth $1500 or $1600. Miller also engaged 1000 bushels of corn of Hemphill, to be delivered on the premises in the following November, at the rate of fifty cents per bushel, and was to let him have a negro man not over 25 years of age, for which Hemphill was to pay him $600 in the way of labor done on the premises. That the next day a conditional contract about the premises sold by Hemphill to Miller, and the work to be done on the same, was made, and the witness was called on by both parties to witness, that if Miller failed to pay Hemphill for all his labor done on the premises, and for 1000 bushels of corn in the month of November, that "Hemphill *mout* know that he had declined moving to the country; and, in that event, all contracts, both written and verbal, should be void, and the deed and the note to be given up."

*Jesse H. Hall* stated, that there were between 120 and 140 acres of land cleared, fenced, and put in cultivation, on the place for which this suit was brought, for which $1500 or $1600 would be a reasonable value for the labor bestowed.

With regard to the state of the pleadings, it may be assumed as entirely clear, that all of the answer is left standing that was not cut out by the ruling of this court, when this cause was here before, to the effect that the complainant's exceptions to the answer should be allowed. Those exceptions, together with all those portions of the answer, which, upon any hypothesis, there would be any color whatever to suppose were affected by them, we have copied above, *in haec verba*. The first part of the answer so copied, sets out under a *vide licet*, a verbal agreement, that Miller should pay Hemphill a reasonable compensation for specified improvements

to be made, and that Miller should deliver the negro to pay for the 1000 bushels of corn, and the residue of his price to go in part payment of the improvements to be made.   And the second part beginning with, "and it was then and there further verbally agreed, &c," sets out that the deed should be left in the hands of Pryor and in case Miller did not come, on or before the 1st day of November, 1834, and receive the place, and the 1000 bushels of corn, and pay the value of all additional improvements to be made over and above so much of the value of the negro man, as was to go to pay for the corn, then Pryor to deliver up the deed to Hemphill, and Hemphill to deliver up the note, and all contracts, both written and verbal, between Miller and Hemphill, to be dissolved.

The exceptions are in terms to so much of the answer, &c., as sets forth that it was verbally agreed, &c., that the deed should be left with Pryor, &c., and in case Miller did not come "on or before the 1st November, 1834, and receive possession of said improvement, and comply," &c., that the deed should be delivered up, and also the note, and all contracts, verbal and written, between Miller and Hemphill, to be canceled and dissolved.

The substance of the whole then is, that the first part of the above copied answer, set out a subsequent verbal agreement in terms. The second part set up an additional agreement, that if these stipulations (repeating them) were not complied with by Miller, within a specified time, that not only *these*, but all *previous* contracts, both verbal and written, between the parties, were to become thereby dissolved.   The exceptions, it is plain, were to the second part only, submitting that the legal effect of the *subsequent verbal* agreement, was not to dissolve the *prior* agreements between the parties made under *seal;* that the law would not allow such an agreement to have such an effect.   In connection with the exceptions to the answer, this was the only question argued and submitted to this court, when this case was here before, and that was the only question considered, and decided in reference to the exceptions.   This court in the opinion delivered, after announcing that

the remaining question related to the complainant's exceptions to the defendant's answer; and, in brief and general terms, stating the substance of the two verbal agreements, and what the complainant *insisted upon* as to the second verbal agreement, which was, "that it could not have any legal effect to defeat the original contract, executed by the deed of conveyance by the one party, and the execution of promissory note payable the 1st January, 1835, by the other party," proceeds to hold that position to be well taken, for the several reasons there distinctly given : and then remarking that, "even if this was *not the true ground* upon which to place this case, and it were to be placed on the ground of a sealed executory contract," proceeds to show that the legal result would be the same, and that it could not in *that* view, work a *discharge* of the *sealed contract*," and concludes that "in any legal view then of the case, it is clear that the court below erred in overruling the complainant's exceptions to the defendant's answer."

The exceptions then which were thus sustained, *going only to so* much of the answer as set up, in substance, that by the subsequent agreement, the deed was to be deposited with Pryor, &c., and if Miller did not comply with all the several stipulations between the parties, the deed and note were to be delivered up, and all contracts were to be dissolved and canceled, necessarily *left standing* in the answer, all the first part, above copied, in which "it is set up that Miller was to pay a reasonable compensation for the specified improvements to be made ; and as much of the depositions suppressed tended directly to sustain *this part* of the answer ; and was, therefore, relevant and applicable to the issues, and the motion to suppress was general, and did not discriminate between such parts [of the depositions as ˎwere relevant and applicable to the issues, and such as were not, the motion ought to have been refused instead of being allowed, as it was by the court below.

For this error, the decree must be reversed. And upon looking into the whole case as now presented, with a view of proceeding to make such decree, under the provisions of the statute, as the

Circuit Court ought to have made, to be certified to that court, and to be entered up and executed as the decree of that court, we are of opinion, that specific performance ought not to be decreed, as well because the sale of the public lands by the government, upon which the improvement in question was situated, since the commencement of this suit, has rendered it impossible; as because the complainant, not having shown himself prompt and ready by accounting in any reasonable manner for his apparent laches, it does not appear proper.

But, under the circumstances of the case, he may be allowed to ratify the sale to Carson, and hold Hemphill to account, as a trustee, for the purchase money received by him. And in taking this account, inasmuch as Miller never paid the $500, due the 1st January, 1835, interest should be computed upon that sum from that day until the 30th of April, 1835, and the aggregate deducted from the sum of $1000, that day paid Hemphill by Carson. Upon this balance, interest should be computed against Hemphill for twelve months, and added to the balance, and to that aggregate, the sum of twelve hundred dollars should be added, being the residue of the $2.200, which Hemphill admits in his answer to have received in April, 1836, as the price of the improvement in controversy. Then from the last aggregate, the sum of sixteen hundred dollars must be deducted as a reasonable compensation for the improvements Hemphill had made after the sale to Miller, and before that to Carson; the use of the premises during that time, being regarded as equivalent to interest on the $1600. Then upon the balance found, interest to be computed up to this day, and a decree rendered for Miller against Hemphill for the aggregate, with costs.